UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GREENBERG TRAURIG LLP**
Alan J. Brody, Esq.
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Tel:     (973) 443-3543
Fax:     (973) 360-7900
BrodyA@gtlaw.com

*Proposed Counsel for Debtors and
Debtors-in-Possession*

| | |
|---|---|
| In re: | Case No. 18-29070 (_____) |
| Optical Holdings of Puerto Rico, LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | Judge:  Hon. |
| | (Joint Administration Requested) |

## DECLARATION OF DR. RANDY NISSINOFF IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Randy Nissinoff, pursuant to 28 U.S.C. § 1746, declare as follows:

       1.     I am the Co-Chief Executive Officer, Co-President, Co-Chief Financial Officer

and Co-Secretary of each of the above-captioned debtors and debtors-in-possession (the

"Debtors").

       2.     I held these positions since the Debtors were formed in 2015.  My duties include

overall management of the Debtors, including day-to-day operations, employee management,

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are: Optical Holdings of Puerto Rico, LLC (2602) and OHI of Puerto Rico L.L.C. (8323).  The Debtors' business address is 275 Route 22 East, Springfield, NJ 07081.

and inventory management.

3.    Debtor Optical Holdings of Puerto Rico, LLC ("Optical") is a Delaware limited liability company.  Debtor OHI of Puerto Rico L.L.C. ("OHIPR") is a Puerto Rico limited liability company and is wholly owned by Optical.  The principal office for each Debtor is located at 275 Route 22 East, Springfield, New Jersey 07081.  As discussed herein, the Debtors are in the business of operating Pearle Vision® stores.

4.    I submit this declaration (the "Declaration") in support of the voluntary petitions for relief for the Debtors' cases (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of the date hereof (the "Petition Date") or concurrently herewith (collectively, the "First Day Pleadings").

5.    I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge and insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations, permit an effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.

6.    Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtors' professional advisors, including Greenberg Traurig, LLP, and/or my opinion based upon my experience, and/or knowledge and information concerning the Debtors' financial

2

records. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

7.      I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I would testify competently to the facts set forth herein.

## Part I:  Background and Filing of Chapter 11 Cases

**A.  General Background of the Debtors'
Formation, Debtors' Operations and Shutdown
of Stores and Events Leading to the Filing of the Chapter 11 Cases.**

8.      The Debtors were formed in 2015 for the purpose of operating eleven (11) Pearle Vision® optical eye care centers through a license agreement with Luxottica Retail North America, Inc.

9.      Shortly after the Debtors began operating the stores, the Debtors were faced with the reality that many of the stores were operating at a loss or otherwise needed substantial capital to operate.  As a result, for the three years after acquiring the stores, the Debtors invested over $2.5 million to update their stores and divested unprofitable locations.

10.      The Debtors' largest capital expenditure was to remodel what is now their remaining operating store -- located in Plaza Las Americas in San Juan, PR. The remodeling took over a year to complete and the Debtors spent over $725,000. The remodeling was completed in December 2016.

11.      The capital-intensive endeavor created liquidity issues and the Debtors fell behind on their payments to vendors.  Accordingly, the Debtors spent the first half of 2017 improving their vendor relationships and satisfying outstanding obligations.  However, in September 2017, Hurricane Maria devastated the island, significantly disrupting the Debtors' operations and

thwarting their restructuring efforts.

12.     At the time Hurricane Maria hit the island, the Debtors had ten operating stores.[2] As widely reported in the press, the Hurricane caused an island-wide shut down for nearly three months.  Most of the Debtors' stores faced business interruption from September 2017 through November 2017.

13.     Further, five of the Debtors' stores experienced significant flooding.  The moisture, together with the heat, caused mold that destroyed substantially everything in the stores. These five stores remained closed because, among other reasons, the Debtors did not have sufficient capital to rebuild them.  The leases for all of these stores expired prior to the Petition Date.

14.     The impact of Hurricane Maria also accelerated the Debtors' divestiture of stores. The Debtors chose not to renew a month-to-month lease for one of their stores in order to conserve capital and reduce corporate overhead. The Debtors also sold three of their stores to another franchisee in 2018 for $125,000.  The sale brought in needed funds; it also cut the Debtors' costs while they sought to stabilize their remaining operations.

15.     As a result, as of the Petition Date, the Debtors have only one operating store -- in Plaza Las Americas.

16.     The Debtors' shut down of stores proved expensive.  Approximately twenty (20) of OHIPR's former employees that previously worked at the now-closed stores, individually brought labor claims or made demands against OHIPR for violations under Puerto Rico labor law.  To date, the former employees have asserted over $4 million in cumulative damages.  From

---

[2]     One of the eleven stores (which operated at a loss) was shut down in December 2015 after the lease expired.

NJ 231000820v6

April 2018 through August 2018, four of these former employees obtained judgments for over $1.8 million, cumulatively.

17.     The Debtors are filing these Chapter 11 Cases to stay the litigation and obtain necessary breathing space in order to evaluate their restructuring options.  The Debtors anticipate that they will continue their efforts to reduce costs and divest themselves of unprofitable stores; all while evaluating how to restructure their operations so that the Debtors, and in particular, the Plaza Las Americas store, can continue to operate. The continued viability of the Debtors' business is in the best interest of their constituents, including employees, customers, and creditors.

**B.  Prepetition Debt Structure**

18.     The Debtors estimate their physical assets are worth approximately $535,000, consisting of cash-on-hand (~$20,000), inventory (~$65,000), office supplies (~$5,000) and FF&E (~$445,000).

19.     <u>Secured Debt</u>.  The Debtors do not have any secured debt.  Accordingly, the Debtors are not required to seek any authority to use cash collateral in these Chapter 11 Cases.

20.     <u>Material Unsecured Debt</u>.

    a.     The Debtors are party to that certain Letter Agreement, dated March 17, 2015 with Essilor of America, Inc. ("<u>Essilor</u>"), pursuant to which Essilor provided financing for the Debtors to acquire the stores.  As of the Petition Date, the Debtors owe approximately $1 million to Essilor.

    b.     In or around May 2015, the Debtors obtained $1.1 million in financing from Ascentium Capital ("<u>Ascentium</u>") to help them acquire the stores.  As of the Petition Date, the Debtors owe approximately $430,000 to Ascentium.

    c.     The Debtors are also party to a credit agreement and guaranty with FirstBank Puerto Rico ("<u>FirstBank</u>"), pursuant to which the Debtors borrowed $250,000.  As of the Petition Date, the Debtors owe

approximately $100,000 to FirstBank.

21.     Optical's principals have personal guarantees for amounts owed to Ascentium, Essilor and FirstBank, among others.

22.     <u>Trade Debt</u>. As of the Petition Date, the Debtors have aggregate unsecured debts totaling approximately $500,000 for merchandise, utilities, professional fees, insurance, and trade vendor payables.

23.     <u>Litigation Claims</u>.  As discussed above, former employees brought claims against OHIPR under Puerto Rico labor law.  As of the Petition Date, former employees have asserted over $4 million in claims -- some of whom obtained judgments against OHIPR.

## Part II:  <u>First Day Pleadings</u>[3]

24.     It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their vendors, employees, and customers. To that end, the Debtors have filed the First Day Pleadings seeking relief intended to allow the Debtors to transition into chapter 11 effectively and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.  Unless the "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

25.     Only one of the First Day Pleadings requests authority to pay pre-petition claims – specifically, employee-related claims. I understand that the Bankruptcy Rules do not permit the

---

[3]     Any capitalized term used but not defined herein shall have the meaning ascribed to it in the respective First Day Pleading.  This section is intended only as a summary of the key provisions of the First Day Pleadings and the relief sought therein. To the extent that this Declaration is inconsistent with any provisions of any of the First Day Pleadings, the terms of the First Day Pleadings shall control. The Court is respectfully referred to the First Day Pleadings for the full details thereof.

Court to consider motions to pay pre-petition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."

26.     In light of this limitation, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

**A. Debtors' Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases ("Joint Administration Motion").**

27.     The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, *In re Optical Holdings of Puerto Rico, LLC.* Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

28.     Joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors or their creditors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

NJ 231000820v6

29.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

**B.  Debtors' Motion for Entry of an Order Extending the Debtors' Time to File their Schedules of Assets and Liabilities and Statements of Financial Affairs ("<u>Motion to Extend Time to File Statements and Schedules</u>").**

30.     By way of the Motion to Extend Time to File Statements and Schedules, the Debtors seeks entry of an order, pursuant to Bankruptcy Rules 1007 and 9006, extending the time within which the Debtors must file their schedules of assets and liabilities, statements of financial affairs, and schedules of executory contracts and unexpired leases (collectively, the "<u>Schedules and Statements</u>"), as required by section 521 of the Bankruptcy Code, through and including October 25, 2018, a date which is thirty (30) days after the Petition Date.

31.     As noted above, the Debtors filed the Chapter 11 Cases to stay the litigation claims and to prevent any judgment creditor from perfecting their judgments.  As a result, the Debtors have not had the opportunity to compile the information necessary for the Schedules and Statements.

32.     The Debtors' management and employees, together with their outside legal counsel, will work diligently to compile the information necessary for the Schedules and Statements. The magnitude of that task, when taken together with the considerable stresses of preparing for the filing of these Chapter 11 Cases, navigating the early stages of the bankruptcy cases, and ongoing burdens of operating the Debtors' business day-to-day, supports an extension

of the deadline set forth in the Bankruptcy Rules for filing the Schedules and Statements.

33.    Further, the relief requested in the Motion to Extend Time to File Statements and Schedules will not prejudice or adversely affect the rights of the Debtors' creditors or other parties-in-interest. Rather the extension requested will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Motion to Extend Time to File Statements and Schedules should be granted.

**C. Debtors' Motion for an Interim Order and a Final Order (A) Authorizing the Debtors to Continue and Maintain their Existing Cash Management System, Bank Accounts and Business Forms, (B) Modifying the Investment Guidelines, and (C) Granting Related Relief ("Cash Management Motion").**

34.    To facilitate the operation of its business, OHIPR maintains two bank accounts held at Banco Popular of Puerto Rico  ("Banco Popular") and Bank of America ("BoA, and together with Banco Popular, the "Banks"). Each of the Banks is a financially stable banking institution and is insured by the Federal Deposit Insurance Corporation (the "FDIC"). A detailed listing of OHIPR's accounts (the "Bank Accounts") is annexed as Exhibit 1 to the proposed Orders attached to the Cash Management Motion.

35.    In the ordinary course of business, OHIPR maintains a Cash Management System to receive and disburse funds utilizing the Bank Accounts. Specifically, credit card receipts and insurance receipts are deposited at the BoA Bank Account, and OHIPR uses that account to fund payroll and OHIPR's operating expenses. Cash and checks receipts from patients as well as a portion of the insurance receipts are deposited at the Banco Popular Bank Account. Further, OHIPR established automated payments with two of its vendors from this account. The Cash Management System is used in connection with satisfying OHIPR's day-to-day operating

expenses.

36.     Permitting continued use of the existing Bank Accounts and Cash Management System is in the best interests of the Debtors' estates, their creditors and other interested parties. At this early stage of these Chapter 11 Cases, it is critical that the Debtors are able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their business. Through the Cash Management System and Bank Accounts, OHIPR is able to effectively and efficiently collect, transfer, and disburse funds as needed, as well as to efficiently monitor and control the movement of cash.

37.     The Debtors will work closely with their banking institutions to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court. The Debtors will also maintain records of all transfers within the Cash Management System so that all transfers and transactions will be documented in their books and records to the same extent such information was maintained by the Debtors prior to the Petition Date.

38.     To require the Debtors to establish new accounts at the present time would be disruptive to their business and would impair their efforts to maximize the value of their estates for the benefit of their creditors and parties-in-interest. Requiring the Debtors to adopt a new, segmented cash management system would be create unnecessary administrative burdens and be much more disruptive than productive.

39.     Moreover, having to open new accounts as of the Petition Date would unnecessarily distract the Debtors' accounting and financial personnel whose efforts are more appropriately focused on assisting with the Debtors' restructuring efforts and preparing the

schedules of assets and liabilities and statements of financial affairs. Furthermore, any delays or disruption in the payment of wages and other employee-related expenses resulting from changing bank accounts would erode employee morale at this critical time, an outcome that would severely hamper the Debtors' restructuring efforts.

40.     Conversely, maintenance of the Debtors' Bank Accounts and Cash Management System at the present time would avoid delays in the payment of necessary expenses and will ensure a smooth transition into chapter 11 without the inconvenience, cost, confusion and delay associated with transferring cash management operations to new accounts. By allowing the continued use of their existing Bank Accounts and Cash Management System, the Debtors will have the unimpeded cash flow necessary for the maintenance of their operations.

41.     The Debtors also request authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts. In accordance with existing practices, the Debtors will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of these cases and will ensure that their records properly distinguish between pre- and postpetition transactions.

42.     In order to minimize expenses and unnecessary distractions to the Debtors' estates, by the Cash Management Motion, the Debtors also request authorization to continue to use all Business Forms without adding a reference to the Debtors' status as debtors-in-possession. Authorization to use their existing Business Forms will facilitate a smooth and orderly transition into chapter 11 and minimize disruption to the Debtors' business affairs.

NJ 231000820v6

Changing Business Forms would be expensive, unnecessary and burdensome to the Debtors' estates, disruptive to the Debtors' business operations and would not confer any benefit upon the Debtors, their estates, their creditors or those conducting business with the Debtors.

43.     By the Cash Management Motion, the Debtors are seeking modification of the deposit guidelines of section 345(b) of the Bankruptcy Code.  Such modification will facilitate a smooth and orderly transition into chapter 11 and minimize disruption to the Debtors' business affairs. The deposits at issue are secure because of the strength of the Debtors' banking institutions and the available FDIC insurance.  Requiring the Debtors to change their deposits and other procedures abruptly could result in harm to the Debtors, their estates and their creditors because it would disrupt the Debtors' Cash Management System. In addition, requiring the Debtors to open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily burdensome and would prevent the Debtors' limited financial staff from focusing their undivided attention on the Debtors' efforts to reorganize their business.

**D. Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Pay Certain Prepetition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that Debtors May Continue Prepetition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests ("<u>Employee Wages Motion</u>").**

44.     OHIPR employs twenty-two Employees: twenty (20) Full-Time Employees and two (2) Part-Time Employees. OHIPR's leadership team is paid on a salary basis which includes managers and administrators. All remaining Employees are hourly and are subject to paid days based on hourly work.  Further, certain of the Employees are eligible for commissions.

45.     To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain morale and stability during this critical time, the Debtors seek authority to pay and honor, in their sole discretion, certain prepetition claims for, among other items: wages, salaries, other compensation, expense reimbursement, withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health benefits, insurance benefits, workers' compensation benefits, and vacation time and other paid time off and all other benefits that OHIPR historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Obligations") and to pay all costs incident to the foregoing.

46.     The Employee Obligations owing to the Employees during the 180 days preceding the Petition Date does not exceed the $12,850 cap of 11 U.S.C. § 507(a)(4), (a)(5).

### 1. Employee Obligations

47.     In the ordinary course of business, OHIPR incurs payroll obligations to its Employees. OHIPR pays its Employees periodic payments for wages and salaries on a bi-weekly basis.  Commissions are paid on the last payroll each month.   All of the Employees are paid in arrears and have not been paid all of their prepetition wages and compensation. All of the Employees receive their wages, commissions, and salaries by check or direct deposit.

48.     On average, OHIPR has gross bi-weekly payroll expenses of approximately $33,500 (including all employee deductions, withholding and employer-paid taxes and benefits). OHIPR's last payroll for the Employees was paid on September 14, 2018 for the pay period ending September 9, 2018.

NJ 231000820v6

49.     OHIPR maintains operating accounts with Banco Popular and BoA.   OHIPR outsources payroll to its payroll services company, ADP, LLC (the "PSC").   In the ordinary course of business, OHIPR provides the PSC a schedule in advance of the payroll payment period and wires funds to the PSC from its operating account in advance of each payday. PSC then issues payment directly to the Employees via check or direct deposit, *less* all necessary or applicable withholdings from such checks.

50.     As of the Petition Date, approximately $40,000 in prepetition accrued wages, salaries, and commissions, benefits and other compensation (but excluding Vacation Time and other PTO) earned prior to the Petition Date remains unpaid (the "Unpaid Compensation").

### 2.  Deductions and Withholdings

51.     During each applicable pay period, OHIPR, through the PSC, routinely deducts certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").   OHIPR, through the PSC, forwards the amount of the Deductions to the appropriate third-party recipients. On average, OHIPR deducts approximately $150.00 from its Employees' paychecks per payroll.

52.     OHIPR is required by law to withhold from an Employee's wages amounts related to federal and local income taxes, social security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "Withheld Amounts"). The Withheld Amounts are approximately $4,200 per payroll.

53.     Further, OHIPR pays social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and local unemployment insurance (collectively, the "Employer Payroll Taxes"). The Employer Payroll Taxes are approximately $2,500 per payroll.

54.     Prior to the Petition Date, OHIPR withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "Payroll Taxes"), but such funds have not yet been forwarded to the appropriate taxing authorities.

### 3.   Honoring Checks for, and Payment of, Reimbursable Expenses

55.     Prior to the Petition Date and in the ordinary course of its business, OHIPR reimbursed Employees for certain reasonable and customary expenses incurred on behalf of OHIPR in the scope of their employment (the "Reimbursable Expenses").

56.     The Employees typically submit expense requests on a monthly basis and are normally reimbursed on the last payroll of each month. The Reimbursable Expenses typically include purchases of miscellaneous supplies and materials and other business-related expenses that are paid by the Employee.

57.     As of the Petition Date, the Debtors are not aware of any outstanding Reimbursable Expenses.  It is possible that certain Employees may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to OHIPR after the Petition Date.  Out of abundance of caution, the Debtors request authority to reimburse the Employees' Reimbursable Expenses up to $1,000.  The Debtors do not anticipate that such requests will be significant and will not create any material cash flow

requirements beyond the Debtors' normal obligations.

### 4. Employee Benefits

58.     OHIPR offers certain Employees the ability to participate in a number of insurance and benefits programs, including health care, workers' compensation, and PTO (collectively, the "Employee Benefit Programs").

- **Medical Plan**

59.     OHIPR's third-party insured medical plan is administered through Mapfre Life Insurance Co. of Puerto Rico. Employees who participate in the medical plan are provided with HMO (Health Maintenance Organization) and prescription drug coverage. Six (6) Employees participate in the medical plan which costs OHIPR approximately $1,000 per month.

- **Workers' Compensation**

60.     OHIPR provides workers' compensation insurance for its Employees (the "WC Program"), which is provided through Corporacion del Fondo del Seguro del Estado (the "WC Insurer").

61.     The WC Insurer administers and pays OHIPR's workers' compensation claims. Premium costs and claims reimbursement costs are approximately $1,100 per month. OHIPR pays annual insurance premiums and fees to WC Insurer in an aggregate amount of approximately $13,500 for the policy period of 2017 through 2018. It is possible that an Employee may have a worker's compensation claim that accrued prepetition but was not submitted to OHIPR prior to the Petition Date.

62.     For the claims administration process to operate in an efficient manner and to ensure that OHIPR complies with requirements, claim assessment, determination, and

16

adjudication must continue. The costs associated with the WC Program may fluctuate according to the various claims submitted.

- **Vacation Time and Paid Time Off**

63.     OHIPR provides vacation time and other paid time off to its Employees as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrues is generally determined by the Employee's length of employment and company policy.

64.     When an Employee elects to take Vacation Time, that Employee is either paid his or her regular hourly or salaried rate, or a flat daily rate. Unused Vacation Time cannot be carried forward to a new calendar year and Employees may not cash out their unused Vacation Time upon termination. The Debtors estimate that approximately $50,000 earned but unused Vacation Time for Employees will have accrued as of the Petition Date.

65.     In addition, in the ordinary course of business, Employees are eligible to accrue personal days or paid-time-off under company policy ("PTO"). Unused PTO can be carried forward to a new calendar year. Employees may not cash out their unused PTO upon termination.

66.     OHIPR also allows its Employees to take certain other leaves of absence for personal reasons ("Leaves of Absence"), such as family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves, and bereavement leaves.

67.     The Debtors anticipate that the Employees will utilize any accrued Vacation Time, PTO, and Leaves of Absence in the ordinary course of business, which will not create any

17

material cash flow requirements beyond OHIPR's normal payroll obligations.

68.     The Debtors seek authority to satisfy Employee Obligations to ensure the continued operation of the Debtors' business and to maintain the Employees' morale, many of whom would suffer extreme personal hardship and financial difficulty if they are not paid. In addition, the Employee Benefit Programs are an important part of each Employee's total compensation. The Debtors estimate that the aggregate cost of providing the Employee Benefit Programs pales in comparison to the value generated by OHIPR's workforce.  Moreover, as with non-payment of wages or reimbursable expenses, any indication that the Employee Benefit Programs may disappear or may not be honored will prove detrimental to the Debtors' ability to reorganize.

69.     Paying prepetition wages and employee benefits will benefit the estates and the creditors by allowing the Debtors' business operations to continue without interruption. Without the requested relief, the Employees may seek alternative employment opportunities. Such a development would deplete OHIPR's workforce and divert resources to hire new talent, hindering OHIPR's ability to meet customer obligations and, likely, diminishing the prospects of preserving the business as a going concern.

70.     By the Employee Wages Motion, the Debtors are also asking for authority to authorize the Debtors' financial institutions to honor checks and electronic fund transfers. Payments made under the Employee Wages Motion are readily identified as relating to an authorized payment in respect of the prepetition claims of the Employees. Accordingly, payments, other than those relating to authorized payments, will not be honored inadvertently and that all applicable banks and other financial institutions should be authorized and directed,

when requested by the Debtors, to receive, process, honor, and pay any and all payments in respect of the prepetition claims of the Employees.

**E. Debtors' Motion for Entry of an Interim Order and a Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service; (II) Deeming Utility Companies to Have Adequate Assurance of Payment; and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366 ("<u>Utilities Motion</u>").**

71. In connection with the operation of their business, the Debtors obtain electric, water, gas, and telecommunication services provided by several utility companies (the "<u>Utility Providers</u>"). These utility services are provided by three (3) Utility Providers. A list of the Utility Providers is attached as **<u>Exhibit A</u>** to the Utilities Motion (the "<u>Utility List</u>"). The Debtors pay the Utility Providers on average $1,133.65 per month for services rendered.

72. The Utility Providers service the Debtors' remaining operating store, allowing the Debtors to operate their business by, among other things, allowing it to readily communicate with employees, vendors, and customers.

73. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of the reorganization. Any interruption of utility services, even for a short period of time, would disrupt the Debtors' ability to properly service their customer needs, thereby negatively impacting the possibility of maintaining those customer relationships. Such a result could seriously jeopardize the Debtors' reorganization efforts, and, ultimately, their operations and creditor recoveries. It is thus, critical that utility services continue uninterrupted during the Chapter 11 Cases.

**F. Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Insurance Coverage Entered Into Prepetition ("<u>Insurance Motion</u>")**

74. In connection with the operation of their business, the Debtors maintain

numerous insurance policies (the "Insurance Policies"). Specifically, the Debtors maintain four (4) Insurance Policies which are maintained and administered by third-party insurance carriers (collectively, the "Insurance Carriers"). Collectively, these policies provide coverage for: (a) health insurance, (b) workers' compensation liability, (c) general owners' liability, and (d) errors and omissions liability. A schedule of the Insurance Policies is attached to the Insurance Motion as **Exhibit A**. The Debtors finance the premiums through two premium financing agreements (the "PFAs"). The Debtors pay approximately $1,650 per month under their PFAs. The Debtors are current on all premium payments.

75. Continuation of the Insurance Policies is essential to the ongoing operations of the Debtors' business. The Debtors are required to maintain insurance coverage throughout the Chapter 11 proceedings. Further, many of these Insurance Policies are required by law and/or by existing contracts as a pre-condition of continued operations. The Debtors intend to continue making premium payments, including pursuant to their PFAs, as they come due on each of the Insurance Policies.

[Signature Page Follows]

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willingly false, I am subject to punishment.

Date: September 24, 2018

_____
Randy Nissinoff
Co-Chief Executive Officer, Co-President,
Co-Chief Financial Officer and Co-Secretary